SAMUEL ALBA (00031)
D. JASON HAWKINS (09182)
SCOTT YOUNG (10695)
LASHEL SHAW (13862)
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, 11th Floor
Salt Lake City, Utah  84111
Telephone: (801) 521-9000
sa@scmlaw.com
djh@scmlaw.com
rsy@scmlaw.com
lss@scmlaw.com
*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH – CENTRAL DIVISION

| | |
|---|---|
| RAPID ENTERPRISES, LLC, DBA EXPRESS ONE, a Nevada limited liability corporation,<br><br>       Plaintiff,<br><br>vs.<br><br>UNITED STATES POSTAL SERVICE; UNITED STATES OF AMERICA; and JOHN DOES I-X.<br><br>       Defendant. | **PLAINTIFF RAPID ENTERPRISES, LLC, DBA EXPRESS ONE'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION**<br><br>Civil No: 2:22-cv-00627<br><br>Judge Daphne A. Oberg<br><br>**(ORAL ARGUMENT AND EXPEDITED HEARING REQUESTED)** |

## RELIEF REQUESTED AND GROUNDS

Plaintiff Rapid Enterprises, LLC, dba Express One ("Express One") moves the Court for

a temporary restraining order ("TRO"), preliminary injunction, and permanent injunction (1)

preventing Defendants from using Express One's trade secrets, (2) prohibiting the United States

Postal Service ("USPS") from terminating the Shipping Services Contract the parties executed in December 2019, which termination is set to become effective after Friday, September 30, 2022, and (3) requiring the USPS to comply with the Postal Service Reform Act, which prohibits the USPS from precluding competition or creating an unfair competitive advantage. *See* 39 U.S.C. § 404a.

Since 2009, the USPS has contracted with private companies acting as third-party resellers to market USPS services and to drive customers to the USPS. Express One was the first reseller to contract with the USPS. Over the last 13 years, Express One has invested a massive amount of time, effort and resources establishing relationships with its platform partners and building its reseller business, to the exclusion of other business opportunities. This investment has significantly benefitted the USPS as Express One has driven billions of dollars in revenue to the USPS.

Around 2019, the USPS devised a plan to obtain Express One's customer, pricing and business information so that it could develop its own competing platform. The USPS's ultimate goal was to implement a competing USPS platform, terminate the reseller program, including Express One's reseller contract, and take control of Express One's business and profit margin. In order to execute that plan, the USPS made numerous promises and misrepresentations to Express One to induce Express One to trust the USPS, continue investing in and building its reseller network, agree to a new contract, and share its confidential customer, pricing and business information with the USPS.

The USPS has used Express One's trade secrets to develop a competing e-commerce platform and it is now attempting to terminate Express One's contract and to take its business and profits. Express One has filed a complaint for breach of contract, breach of various duties, and

misappropriation of trade secrets, and Express One now seeks TRO and preliminary injunction to stop the USPS from engaging in these illegals acts.

## FACTS[1]

**Express One Becomes an Authorized Reseller for the USPS.**

1.      In 2009, the USPS engaged Express One to become its first authorized reseller. *See* Declaration of Bret Miller, filed herewith (hereinafter "Miller Decl."), at ¶ 3.

2.      The purpose of a reseller is to drive customers and business to the USPS. *See id.* at ¶ 4.

3.      As an authorized reseller, Express One markets primarily to the small and medium sized business segment via technological solutions with an emphasis on e-commerce businesses and online applications. Express One utilizes a modular deployment inside of dozens of multi-carrier shipping software platforms that mainly service e-commerce transactions. *See id.* at ¶ 5.

**The USPS and Express One Enter Into the 2013 Contract.**

4.      In January 2013, the USPS and Express One entered into a Shipping Services Contract ("2013 Contract"), which allowed Express One to serve as an exclusive reseller of USPS products. *See* 2013 Contract, Ex. Dkt. #2-1 to the Complaint; *see also* Miller Decl. at ¶ 6.

5.      In June 2014, the USPS and Express One executed an Amendment of Shipping Services Contract. In June 2016, the USPS and Express One executed Amendment #2 of Shipping Services Contract (the "Second Amendment to the 2013 Contract"), which extended the contract

---

[1] In addition to the facts and evidence set forth herein, Plaintiff has also filed a contemporaneous Motion to Seal that addresses additional compelling evidence supporting this Motion.  Plaintiff filed the Motion to Seal out of an abundance of caution and in an effort to seek direction from the Court.  Plaintiff respectfully requests that the Court consider the Motion to Seal and the evidence set forth therein in conjunction with this Motion and request for injunctive relief.

term to "eight years from the effective date." *See* Second Amendment to the 2013 Contract, Ex.

Dkt. # 2-3 to the Complaint; *see also* Miller Decl. at ¶ 9.

**The USPS Makes Specific Representations to Express One and Encourages Express One to Invest In and Grow its Reseller Network.**

6.     Over the years, the USPS made numerous statements and representations to representatives of Express One in an effort to induce Express One to partner with the USPS and grow its reseller network. Based upon these representations, Express One spent millions of dollars building its technology, contracting with platform partners (software companies) and customers of all sizes, and increasing the profitability of the USPS by increasing their profitable packaging shipping business. *See* Miller Decl. at ¶ 12.

7.     For example, the USPS represented on numerous occasions that its contract with Express One would run through the full contract term and then be renewed, that the USPS had no intention to terminate the contract prematurely, and that the USPS was not going to steal Express One's customers, know-how and confidential business information. *See id.* at ¶ 13.

8.     Based upon the parties' contracts and repeated representations by the USPS, Express One invested a massive amount of time, effort and resources establishing relationships with its platform partners and building its reseller business, to the exclusion of other business opportunities. In fact, Express One started and financially backed software systems such as ShipStation, but could not hold an ownership interest in such companies based upon directives from the USPS. *See id.* at ¶ 14.

9.     When Express One first contracted with the USPS, it brought a large number of customers to the USPS from its prior business (as the first ever authorized reseller for DHL). Since

that time, Express One has spent tens of millions of dollars and thousands of hours building the largest reseller network in the USPS system. *See id.* at ¶ 15.

10.     During the last twelve months, Express One has driven approximately $3 billion of business to the USPS through its reseller network. *See* Declaration of Scott Bryce, filed herewith ("Bryce Decl."), at ¶ 3; *see also* Miller Decl. at ¶ 16.

**The USPS Instructs Express One to Provide Information to Boston Consulting Group**

11. On September 6, 2016, Dennis Nicoski, USPS Director of Field Strategy and Contracts, emailed Bret Miller the following:

**Subject:       Partner Feedback Request**

Greetings Bret. I hope this email finds you well. I'm reaching out to ask your help on an important project.

As you know, we are constantly looking to improve the value of the products that we offer to our customers, and how customers access those products. To that end, we've engaged with The Boston Consulting Group (BCG) to help us assess our strengths and opportunities. As a valued partner of ours, I think your expertise would lend some critical input to this effort. If you can find the time in the next week or so to speak with Tom Schnitzer (cc'ed here) and his team to offer your thoughts on the market in which we compete, I would greatly appreciate it.

Let me know if you have any questions or concerns, otherwise I'll leave it to Tom to work with you to find an amenable time. Thanks in advance for your assistance with this.

DN

Email dated September 6, 2016, attached as Ex. 1 to Miller Decl.

12. One week later, Tom Schnitzer of the BCG then emailed Bret Miller:

I hope all's well. I wanted to follow-up on Dennis's note from last week to see if we can get some time on the calendar to connect, as we would truly value your input to help with our work. 45-60 minutes of your time by phone would be ideal. Do you have any windows of availability next week?

Email dated September 12, 2016, attached as Ex. 1 to Miller Decl.

13. Prior to the conference with the BCG, USPS Manager of Business Alliances, Annette Atkin told Express One (Bret Miller, Scott Bryce, and Kha Ly) that the telephone conference was pivotal to their ongoing success and that they needed to help BCG understand all facets of Express One's business, including, but not limited to, its marketing, revenue streams, business model, etc. *See* Miller Decl. at ¶ 20.

14. Express One followed Ms. Atkin's instructions and when they had their conference with the BCG, Express One provided detailed information about their customers, technology, marketing, pricing, and other critical business information. *See id.*

15. Upon information and belief, the USPS and the BCG used the confidential information it received from Express One to formulate a plan to remove Express One and take its business and profits. *See id.*

16. In 2018, the USPS Office of Inspector General issued a heavily redacted report entitled, "Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business." *See* https://www.uspsoig.gov/sites/default/files/document-library-files/2020/RARC-WP-18-010.pdf, attached hereto as Ex. A.

**The USPS Attempts to Terminate the Reseller Program in 2019.**

17. Despite the USPS's representations and Express One's efforts, on April 3, 2019, the USPS sent Express One a Notice of Termination seeking to terminate Express One's reseller contract. *See* Notice of Termination dated April 3, 2019, attached hereto as Ex. B. In June of 2019, the USPS extended this deadline to December 31, 2019. *See* Miller Decl. at ¶ 25.

18. Express One contested the USPS's Notice of Termination and sent company representatives to Washington D.C. in October 2019 to meet with Gary Reblin, USPS's Vice

President of Innovative Business Technology, to discuss alternatives to termination and the impact that termination would have not just on Express One, but also on the USPS (loss of business). A few weeks later, Mr. Reblin flew to Salt Lake City to continue those discussions. *See id.* at ¶ 27.

19.     Eventually, the USPS retracted the termination and recommitted to Express One, promising Express One that its recommitment was not merely a bait-and-switch effort to change the terms of the 2013 Contract to more favorable terms for the USPS. The USPS sent Mr. Reblin to meet with Bret Miller and convince Express One to accept the "new contract" with promises and representations the USPS viewed Express One as a long-term partner and that the USPS would not terminate the "new contract." *See id.* at ¶ 28-30.

20.     During his trip to Salt Lake City, Mr. Reblin promised Mr. Miller that the USPS was committed to Express One as a reseller and that it "would not pull the rug out from under Express One again." *See id.* at ¶ 31.

21.     Various USPS representatives reaffirmed this promise to Express One on multiple occasions, including Jakki Strako, USPS's Chief Customer and Business Solutions Officer. *See id.* at ¶ 32.

**The USPS and Express One Enter Into the 2019 Contract.**

22.     Express One relied upon the USPS's promises and representations, and the parties entered into in the new Shipping Services Contract executed on December 5, 2019 ("2019 Contract"). *See* 2019 Contract, attached as Ex. Dkt. # 2-4 to Complaint; Miller Decl. at ¶ 34.

23.     As with the 2013 Contract, the 2019 Contract provided, "it is the intention of the Parties to enter into a shipping services contract that will benefit the Postal Service, the postal

system as a whole, and Customer, and that will comply with the requirements of Title 39 United States Code, as amended by the Postal Accountability and Enhancement Act of 2006." *See id.*

24. The 2019 Contract also contained a termination provision that stated, "[t]his Contract shall expire on December 31, 2023, unless: (1) Terminated by the Postal Service with ninety (90) calendar days' notice to Customer in writing .…" *See id.*

25. Representatives from the USPS represented to Express One during the contract negotiation process that the 90-day termination provision was simply a provision from the USPS form contract and that the USPS had no intentions of terminating the contract prematurely. *See* Miller Decl. at ¶ 37; *see also* Decl. of Scott Bryce, attached hereto as Ex. C.

26. In contrast to the 2013 Shipping Services Contract and its amendments, the 2019 Contract greatly expanded Express One's reporting requirements, requiring disclosure of all of Express One's customer and pricing data. *See* 2019 Contract, Ex. Dkt. #2-4 to Complaint, at Section I.

27. In addition, the 2019 Contract required Express One to provide a complete list of registered merchants and platforms, along with their associated payment information, MIDs, tier level and PCIDs. *See id.*, Attachment A.

28. The 2019 Contract, however, restricted how the USPS could use Express One's confidential customer, pricing and business information. Section I.N provides:

> Quarterly Business Reviews. … Customer shall provide the Postal Service with all Tier 2 Merchants, Tier 3 Merchants, and Platforms along with their associated volumes, spend, MIDs, permits or meters, PCIDs where applicable, and all other information the Postal Service determine necessary **for the purposes of validating Merchant and Platform shipping volume and spend per product**.

*Id*., Section I.N (emphasis added).

29.     Likewise, the 2019 Contract recognized the confidential nature of Express One's customer, pricing and business information. *See id.*, Section V.

30.     The 2019 Contract also added a section requiring Express One to exclusively promote the USPS's products. *See id.*, Section I.M. Thus, Express One promoted the USPS and had to forego other business opportunities, including, but not limited to, seeking any ownership in the software companies that it financed. *See* Miller Decl. at ¶ 42.

31.     Express One relied upon the 2019 Contract, together with the repeated promises and representations of the USPS, to continue investing a significant amount of time, effort and resources growing its reseller business and the profitability of the USPS. *See id.* at ¶ 44.

**The USPS Misappropriates Express One's Confidential Business Information and Prepares to Compete Directly with Express One and Other Resellers.**

32.     Although the 2013 Contract contained certain minimal reporting requirements, the USPS never actively required that information. That all changed following execution of the 2019 Contract. In 2020, the USPS began demanding that Express One provide its customer and pricing information along with PCID numbers for each shipping customer and MID numbers for each platform partner. *See* Miller Decl. at ¶¶ 46-50; *see also* Bryce Decl. at ¶¶ 16-22.

33.     In addition, USPS began using new "intake forms' in an effort to obtain more detailed information regarding prospective platform partners and the percent of discount offered by Express One to its platform partners. *See* Bryce Decl. at ¶ 15.

34.     Additional examples of the USPS's efforts to mine Express One's trade secrets and confidential business data include, but are not limited to:

(a)     Josen Punnoose, Channel Strategy & Support for USPS, emailed Scott Bryce and asked, "For all merchants and platforms that you would like to register on Stamps.com,

please include a unique MID for that merchant or platform. Stamps.com can provide that MID for you; We will need that MID when you submit the intake form. For all other PC Postage providers, please use a unique PCID for each merchant and platform that you would like to register." Email dated January 10, 2020, attached as Ex. 2 to Bryce Decl.

(b)     On June 10, 2020, Josen Punnoose emailed Scott Bryce, Bret Miller, and others, and stated,

> Today, our CFO and the USPS committee that oversees NSAs has told us that they will give us until July 31st 2020 to become fully compliant on the visibility part of your NSA. What that simply means is that any registered platform or merchant must have a PCID (if it is Pitney or Easy Post) or MID (if it is Stamps or Endicia) assigned and used in the ICR files to be eligible for the Platform Tier; if not, that platform or merchant will need to use Tier 1 pricing.

Email dated June 10, 2020, attached as Ex. 3 to Miller Decl.

(c)     On July 15, 2020, when Josen Punnoose, Channel Strategy & Support for USPS, emailed Bret Miller and Scott Bryce and stated,

> Over the past few months our internal Customer Experience & Design Strategy (CXDS) team has been working on identifying how to improve our Customer Care strategy for our small business customers. As a next phase, we are researching how platforms who work closely with small businesses take care of their customers and what we (USPS) can learn from that. If you are interested in joining us for a conversation about topics such as sign-up and onboarding customers, guiding them through creating manifests/shipping forms, tracking, and issue resolution, please let me know and I will schedule time with Tom Diefenbach, manager of CXDS, copied on this message.

Email dated July 15, 2020, attached as Ex. 5 to Miller Decl.

(d)     On August 26, 2020, Josen Punnoose emailed Bret Miller and Scott Bryce and stated, "Our pricing department is doing some research to see where our Priority Mail CPP prices sit with our competition. Would you be able to help answer a few quick questions that they have below, please? If not, no worries at all. Q1. What % discounts are competitors giving

merchants off ground and 2-Day Air products? ... Q2. What is USPS's volume % compared to total volume for the below?" Email, dated August 26, 2020, attached as Ex. 6 to Miller Decl.

> (e)     On December 7, 2020, USPS Manager of Business Alliances, Annette Atkin, emailed Express One and requested:

>> We've been asked to put together a presentation for USPS finance leadership. Can you please help to answer these questions below?
>> - Size of their salesforce/agents
>>   - Sales
>>   - Service
>>   - Technical
>> - What are some of the specific types costs that the resellers have? I have put down some that I thought of. Please feel free to add/edit.
>>   - Sales and support personnel
>>   - Technical integrations
>>     - Fees to platforms
>>     - Licensing fees
>>   - Label fee (PC Postage providers)

> Email, dated December 7, 2020, attached as Ex. 4 to Miller Decl.

> (f)     In a phone call with Gary Reblin, Josen Panoose, Bret Miller, and Scott Bryce, the USPS represented it needed this detailed customer, pricing and business information to monitor for "bad actors" and "illegal resellers," and it expressly stated that the information would not be used to compete with Express One or for any other ulterior or nefarious purposes. *See* Miller Decl. at ¶ 51; *see also* Bryce Decl. at ¶ 22.

**Even After Launching USPS Connect eCommerce, the USPS Continued to Reassure Express One that It Would Honor the Parties' Contract.**

35.     On May 3, 2022, the USPS issued a press release announcing its launch of its new e-commerce platform "USPS Connect eCommerce." *See* Miller Decl. at ¶ 55.

36.     The day the USPS launched Connect eCommerce, Express One representatives received a phone call from USPS employee Mark Worrall. He told Express One about the launch

of Connect eCommerce and reassured Express One that **the USPS was not changing the terms of the 2019 Contract**. *See* Miller Decl. at ¶ 56; Bryce Decl. at ¶ 24; Declaration of Kha Ly, filed herewith, ("Ly Decl.") at ¶ 7.

37.     Critically, Mr. Worrall represented to Express One that USPS would not proactively contact Express One's existing platform partners; however, if one of its platform partners reaches out to the USPS and wants to sign up, USPS would allow them to do so. *See* Miller Decl. at ¶ 57; Bryce Decl. at ¶ 25; Ly Decl. at ¶ 8.

38.     This promise was reaffirmed in the meeting in Phoenix, Arizona on May 16-17, 2022 between Bret Miller, Scott Bryce, and Kha Ly, on behalf of Express One, and Shibani Gambhir (a Vice President within the USPS), Mark Worrall, Alexandra Robleto, Annette Atkin and Sara Bambrough on behalf of the USPS. *See* Miller Decl. at ¶ 58; *see also* Bryce Decl. at ¶ 26; Ly Decl. at ¶ 9.

39.     During a phone call around this same time period, Bret Miller asked Jakki Strako of the USPS directly if the USPS was going to cancel Express One's 2019 Contract. In response, Ms. Strako stated "**absolutely not, you still have a year and a half to two years left on your contract**." Miller Decl. at ¶ 59.

40.     In light of the USPS's plan to terminate the reseller program, all of these representations were false and the USPS representatives knew them to be false.  *See* Miller Decl. at ¶ 60.

**Despite Repeated Promises to the Contrary, the USPS Seeks to Terminate the 2019 Contract and to Compete Directly with Express One and Other Resellers.**

41.     In mid-May 2022, Pirate Ship (see www.pirateship.com) was announced as the first platform on the USPS's new Connect eCommerce platform. *See* Ly Decl. at ¶ 10.

12

42.     Upon information and belief, Alan Ladd, a former executive with the USPS, who was involved in the USPS's prior attempt to terminate Express One's reseller contract back in 2019, is associated with Pirate Ship. *See* Bryce Decl. at ¶ 8; Ly Decl. at ¶ 11.

43.     The USPS allows software platforms using Connect eCommerce, such as Pirate Ship, to offer rates below the commercial plus pricing ("CPP"), something that resellers such as Express One are contractually prohibited from doing. *See* 2019 Contract, Complaint Ex. Dkt. #2-4, at Section I.L.

44.     In late May 2022, Express One requested permission from the USPS to allow Express One platform partners to offer rates below CPP so that they could compete with Pirate Ship and other platforms using Connect eCommerce, but the USPS denied that request. *See* Miller Decl. at ¶ 63.

45.     Specifically, on May 19, 2022, Bret Miller emailed Annette Atkin:

Would you please submit for approval to the USPS to allow Express 1 to load a rate card for XPS (and other Partners) at 2% (or equal to Pirate Ship) below CPP. This is absolutely necessary to maintain a competitive balance. We are asking for a rate card that allows us to compete with Pirate Ship in the Market Place.

Email dated May 20, 2022, attached as Ex. 9 to Miller Decl.

46.     Ms. Atkin denied the request, responding that same morning:

Per USPS Management Team,

"Merchant pricing is available to USPS Connect eCommerce approved NSA platform customers only."

"The terms of your reseller contract remain unchanged – reseller registered platforms cannot extend merchant rates below CPP."

*Id*.

47.     The USPS then offered the very same discount Express One had requested to Express One's platform partners. Ismael Villa, a USPS employee sent an email to a number of Express One platform partners, including XPS, the very partner that was the subject of Bret Miller's May 20, 2022 email offering that very same discount. *See* Email dated August 18, 2022, attached as Ex. 10 to Miller Decl. Thus, the USPS denied Express One's request and then used that request to structure an identical offer to Express One's platform partners and take Express One's customers and profit margin for itself.

**Termination of Express One**

48.     On June 30, 2022, Shibani Gamhir and Mark Worrall of the USPS called Bret Miller, CEO of Express One, to inform him that the USPS was discontinuing the reseller program and would be terminating the 2019 Contract. *See* Miller Decl. at ¶ 67.

49.     The next day, on July 1, 2022, the USPS sent Express One a formal notice of termination. *See* Notice of Termination, Ex. 5 [Dkt. # 2-5] to the Complaint.

50.     Upon information and belief, the USPS sent similar termination notices to each of its resellers; however, the USPS did not follow the proper administrative procedures, including approval from the Postal Regulatory Commission, to terminate the reseller program or Express One's reseller contract.

51.     On July 16, 2022, the news site eCommerceBytes published an article entitled "USPS      Kills      Off      a      Discounted-Shipping      Program."      *See* https://www.ecommercebytes.com/C/blog/blog.pl?/pl/2022/7/1657945069.html.      The      article stated: "We're perplexed about how the USPS could end the postage reseller program without going through the Postal Regulatory Commission and without publicly announcing the end of the

program, instead reacting to inquiries with a one-paragraph response that explains little." Attached hereto as Ex. D.

52.    The USPS subsequently provided eCommerceBytes the following response: "The Postal Service undertook an evaluation of its reseller program and has determined that the program as currently structured is not resulting in the customer benefits and efficiencies that were originally envisioned, has caused difficulties in monitoring compliance with pricing and other terms, and should be discontinued." *See id*.

**The Actions of the USPS Are Causing Substantial Harm to Express One and, If Allowed to Stand, Will Destroy Its Business.**

53.    Express One has already begun to suffer irreparable harm as platform partners and customers have learned about the USPS's decision to discontinue the reseller program and terminate Express One's reseller contract. *See* Miller Decl. at ¶ 70; Bryce Decl. at ¶ 27; Ly Decl. at ¶ 12.

54.    By way of example, in August 2022, one of Express One's largest software platform partners, XPS Technologies signed a contract with Postage Force, a large shipping consolidator, in an effort to protect itself from USPS's decision to discontinue the reseller program. *See* Miller Decl. at ¶ 71; Bryce Decl. at ¶ 28.

55.    Express One has heard from other platform partners and customers who are exploring contingency plans in response to the announcement from the USPS. *See* Miller Decl. at ¶ 72; Bryce Decl. at ¶ 29.

56.    For example, one of Express One's first software integrations, dating back to 2010 (ReadyShipper/TrueShip, a/k/a "ReadyCloud"), was contacted directly by the USPS and offered

an opportunity to contract directly with USPS, as the USPS told ReadyCloud that the resellers such as Express One were "dead." *See* LinkedIn page, attached hereto as Ex. E.

57.     The USPS's decision to discontinue the reseller program and terminate its 2019 Contract with Express One, if allowed to stand, will not only cost Express One hundreds of millions of dollars in damages, but will force the company out of business altogether. *See* Miller Decl. at ¶ 73; Bryce Decl. at ¶ 30; Ly Decl. at ¶ 13.

## ARGUMENT

Injunctive relief is appropriate where the movant establishes the following:

(1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

*Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). "In issuing a preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful decision on the merits." *Keirnan v. Utah Transit Auth.*, 339 F.3d 1217, 1220 (10th Cir. 2003) (internal quotation marks omitted).

## I.     IRREPARABLE HARM

"Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements will be considered." *DTC Energy Group, Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (citations omitted). The "irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Id.*

"A threat to trade or business viability may constitute irreparable harm." *Tri-State Gen. & Trans. Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986). "[W]here the party seeking the preliminary injunction is faced with a complete or substantial loss of its business during the pendency of the trial unless the injunction issues," eventual money damages would be only "an empty victory." *Id.*; *see also Husky Ventures, Inc. v. B55 Investments, Ltd.*, 911 F.3d 1000, 1012-13 (10th Cir. 2018) ("Damages flowing from anticipated future injury to one's livelihood or business interests are especially difficult to calculate" and accordingly often represent irreparable harm, especially where the continued existence of the movant's business is at stake.).

By misappropriating Express One's trade secrets, using them to create a competing platform, and then terminating the 2019 Contract, the USPS has irreparably harmed Express One. Indeed, the USPS's actions, if not checked, will destroy the entire business. This can be seen from the USPS's course of conduct. When the USPS first retained Express One and launched the reseller program in 2009, the USPS required Express One to devote its business to USPS products. The USPS refused to allow Express One to hold ownership interests in software companies it helped start, and in the 2019 Contract, it required Express One to promote USPS products. Thus, the USPS has effectively monopolized Express One's business. By terminating its contract with Express One, the USPS has effectively terminated the business it monopolized. Express One no longer has relationships with other vendors and it was not allowed to diversify by developing and purchasing other businesses. Simply put, USPS's termination of the 2019 will destroy Express One's business.

Even if this were in doubt, Express One has submitted evidence that it is losing long-time customers, such as XPS, as a result of the USPS's actions. This harm is irreparable because

Express One cannot simply recoup customers.  These customers are leaving and partnering with other businesses and platforms. This has caused Express One to lose its standing and goodwill in the marketplace.  This irreparable harm will multiply exponentially if the USPS is allowed to shut down Express One's business entirely on Friday, September 30, 2022.

## II.      SUCCESS ON MERITS

"A plaintiff seeking a preliminary injunction must demonstrate that he is likely to succeed on the merits." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Express One has brought claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of the implied duty to disclose superior knowledge, misrepresentation in the inducement of a contract, unjust enrichment, misappropriation of trade secrets, estoppel, and declaratory relief. These claims are likely to succeed.

### A.      Contract Claims

The elements of breach of contract under federal common law are: 1) the existence of a valid contract between the parties; 2) an obligation or duty arising out of the contract; 3) a breach of that duty; and 4) damages caused by the breach. *Pryor v. U.S.*, 85 Fed. Cl. 97, 104 (2008). The Court of Federal Claims has recognized that "[i]n every contract there exists an implied covenant of good faith and fair dealing" but noted that "in order to state a claim premised on a violation of the obligation of good faith and fair dealing, plaintiffs must allege facts which if proved would constitute malice or an intent to injure," overcoming the presumption that government employees always perform their duties in good faith. *So. Cal. Edison v. U.S.*, 58 Fed. Cl. 313, 325 (2003) (internal alteration marks omitted). This can include allegations that the government agency

"intentionally misrepresented facts . . . , intentionally withheld material information, and took affirmative actions to protect its own interests at the expense" of the other party to the contract. *Id.*

The USPS has breached the express terms of the 2019 Contract in three ways. First, the USPS has breached the provision incorporating Title 39 of the United States Code, Postal Accountability Act. *See* 2019 Contract. The statute provides in relevant part as follows:

> (a)   Except as specifically authorized by law, **the Postal Service may not**—
>
> (1) **establish any rule or regulation (including any standard) the effect of which is to preclude competition or establish the terms of competition** unless the Postal Service demonstrates that the regulation does not create an unfair competitive advantage for itself or any entity funded (in whole or in part) by the Postal Service; …
>
> (3) **obtain information from a person that provides (or seeks to provide) any product, and then offer any postal service that uses or is based in whole or in part on such information**, without the consent of the person providing that information, unless substantially the same information is obtained (or obtainable) from an independent source or is otherwise obtained (or obtainable).

39 U.S.C. § 404a(a)(1). The USPS's use of the BCG and the years of mining Express One's trade secrets demonstrate the USPS's plan to eliminate competition from resellers such as Express One and create an unfair competitive advantage for itself. This is also illustrated by Express One's attempt to offer a discount to XPS. On May 19, 2022, Express One emailed the USPS (Annette Atkin) requesting a rate below CPP on behalf of XPS to remain competitive in the marketplace. The next day, the USPS denied Express One's request and then, after announcing the termination of the 2019 Contract, on August 18, 2022, USPS employee Ismail Villa offered XPS the very discount Express One had requested. There can be no better example of creating an unfair competitive advantage.

Second, the USPS has misused Express One's customer and pricing data in violation of Section I.N. This section states:

> On a quarterly basis, Customer shall provide the Postal Service with all Tier 2 Merchants, Tier 3 Merchants, and Platforms along with their associated volumes, spend, MIDs, permits or meters, PCID's where applicable, and all information the Postal Service deems necessary for the purposes of validating Merchant and Platform shipping volume and spend per product.

2019 Contract (emphasis added). This section requires Express One to provide the USPS with all of its confidential customer data; however, it limits the USPS's use of that data to "validating Merchant and Platform shipping volume and spend per product." The USPS has used Express One's confidential customer data in breach of this provision to create a competing platform in an effort to take Express One's business and profits. This fact is confirmed by the evidence addressed in Express One's contemporaneous Motion to Seal.

Finally, it appears that the USPS failed to obtain required approval from the Postal Regulatory Commission for termination of the 2019 Contract. As noted in Express One's Complaint, industry news site eCommerceBytes wrote, "We're perplexed about how the USPS could end the postage reseller program without going through the Postal Regulatory Commission and without publicly announcing the end of the program, instead reacting to inquiries with a one-paragraph response that explains little." "USPS Kills Off a Discounted-Shipping Program." *See* https://www.ecommercebytes.com/C/blog/blog.pl?/pl/2022/7/1657945069.html. The USPS did not explain how it had complied with the Postal Regulatory Commission, and Express One does not believe it has complied.

In addition to these express breaches, the USPS has repeatedly breached the implied duty of good faith and fair dealing and duty to disclose superior knowledge by hiding its plan to take

Express One's business. The USPS also made numerous misrepresentations over the years to induce Express One to enter into a new contract, provide detailed trade secret information to USPS, and promote USPS to the exclusion of any competitors, all the while implementing a plan to create a competing platform and steal Express One's customers and business. Frankly, it is hard to imagine a better example of "bad faith." This evidence shows that Express One is likely to succeed on the merits on these claims and an injunction enforcing the 2019 Contract is warranted. *See Westchester Legal Services, Inc. v. Westchester County*, 607 F. Supp. 1379, 1385-86 (S.D.N.Y. 1985)("[I]t is hereby ordered that the defendants … are preliminarily enjoined from doing the following: … (2) terminating or failing to renew the contract between the County of Westchester and Welserv …").

Courts have frequently enjoined attempts to illegally terminate contracts and entered injunctions enforcing contracts, and this Court should do so here. *See York Risk Serv. Group, Inc. v. Couture,* 787 Fed. Appx. 301 (6th Cir. 2019) (affirming preliminary injunction to enforce restrictive covenants in employee's stock option contract); *see also Day Companies, Inc. v. Patat*, 440 F.3d 1343 (5th Cir. 1971) (affirming injunction to enforce contract not to compete); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("[A] plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative" qualifies for injunctive relief.").

### B.   Misappropriation of Trade Secrets – 18 U.S.C. § 1836

Express One has also brought claims for misappropriation of trade secrets under 18 U.S.C. § 1836, Utah Code Ann. § 13-24-1 *et seq*., the United States Constitution, and common law. To prevail on a trade secret claim under the Defense of Trade Secrets Act, a plaintiff must show "(1)

the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means." *John Bean Tech. Corp. v. B GSE Grp.*, 480 F. Supp. 3d 1274, 1302 (D. Utah 2020). "Trade secret" means "all forms and types of information that (1) derives value from being secret and (2) that the owner took reasonable measures to keep secret." *Id.*

Express One is likely to prevail on its trade secret claims. The USPS acknowledges the data Express One provided were trade secrets in the 2019 Contract, agreeing to its limited use in Section I.N and that it was confidential in Section V. But the USPS then used those trade secrets to compete against Express One and steal its customers without Express One's consent. The USPS knew or should have known that this was improper under the express and implied terms of the 2019 Contract. Thus, Express One is likely to succeed on these claims as well. The Defense of Trade Secrets Act expressly allows for entry of an injunction to protect a party's trade secrets. *See* 18 U.S.C. § 1836(b)(3).

### C.    Estoppel and Declaratory Judgment

For the reasons set forth above, Express One is also likely to succeed on the merits of its estoppel and declaratory judgment claims as well.

### III.    BALANCE OF INTERESTS / PUBLIC POLICY

"The third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). "[D]emocratically elected representatives" are best positioned "to determine the public interest with respect to questions of social and economic policy." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1191 (10th Cir.

2003); *see also Fish v. Kobach*, 840 F.3d 710, 755-56 (10th Cir. 2016) (Congress' determination of public interest paramount in evaluating motion for injunctive relief against government). By enacting Section 404a, Congress has declared that it is in the public interest that the USPS compete with private companies without unfair advantage or the benefit of other's intellectual property. *See* 39 U.S.C. § 404a(a); *see also* 152 Cong. Rec. S11676 (daily ed. Dec. 8, 2006) (explaining the importance of the legislation in ensuring USPS is on a "playing field that is a bit more level" with respect to private companies).

Courts have recognized in similar contexts that preliminary injunctions prohibiting contractual termination are in the public interest where only such relief will allow the plaintiff to remain in business while its apparently meritorious legal claims are tried, particularly where such businesses were built through years of effort and expenditure. *See Milson Co. v. Southland Corp.*, 454 F.2d 363, 366-67 (7th Cir. 1971). Congress has also adopted the DTSA, evincing strong public policy interest in protecting trade secrets. *Edward D. Jones & Co. v. Peterson*, 2019 KWL 5889291, * 3 (D. Nev. Nov. 12, 2019) ("[P]ublic policy weighs in favor of issuing a temporary restraining order. As is evidenced by the existence of the DTSA . . . , there is a well-recognized public interest in protecting trade secrets."); *see also Novell, Inc. v. Timpanogos Research Group Inc.*, 46 U.S.P.Q.2d 1197 (D. Utah 1998) ("As demonstrated by Utah's adoption of the Trade Secrets Act, public policy does support the development of new technologies by authorizing injunctive protection of trade secrets.") (citation omitted); S. Rep. 114-220, at 1-3 (2016) (explaining that trade secret theft has had a detrimental impact on the American public and the DTSA will "incentivize future innovation while protecting and encouraging the creation of

American jobs"). In addition, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

It is in the public interest to enjoin the USPS from breaching the 2019 Contract as set forth above, misusing Express One's trade secrets, and violating 39 U.S.C. § 404a. Moreover, the balance of interests favors injunctive relief. Failure to enter an injunction will result in the complete destruction of Express One's business. By contrast, the USPS has functioned, and indeed excelled, for years with Express One as its partner.

## CONCLUSION

For the reasons set forth above, the Court should enter a TRO, preliminary injunction, and permanent injunction (1) preventing Defendants from using Express One's trade secrets, (2) prohibiting the USPS from terminating the 2019 Contract, and (3) requiring the USPS to comply with the Postal Service Reform Act, which prohibits the USPS from precluding competition or creating an unfair competitive advantage. It is imperative that the Court enter a TRO by Friday, September 30, 2022 – the date on which the USPS intends to terminate the 2019 Contract and effectively put Express One out of business.

DATED this 29th day of September, 2022.

**SNOW CHRISTENSEN & MARTINEAU**

 /s/  *Samuel Alba*
Samuel Alba
D. Jason Hawkins
Scott Young
LaShel Shaw
*Attorneys for Plaintiff*