# EXHIBIT A



Office of Inspector General | United States Postal Service

## RARC Report

# Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business

Report Number RARC-WP-18-010 | July 23, 2018



# Table of Contents

Cover

Executive Summary .................................................................... 1

   The OIG Recommends that the Postal Service ................... 2

████████ ............................................................................ 3

   Introduction .......................................................................... 3

   History of Partnerships and Discounts ............................... 3

     USPS Outsources Electronic Postage to PC Postage Providers ........ 4

     Postal Reform Greases the Wheels for
     Negotiated Service Agreements ....................................... 4

     ██████████████████ ............................................ 4

   Ecommerce Boom, Technology Roil the Package Market ........ 5

     ███████████████ ..................................................... 6

     ████████████████████ ...................................... 7

     ████████████ ........................................................... 8

   Management of Channel Part█████ ................................. 9

     ████████████████ ................................................. 9

     ██████████████████████ ............................... 10

     ████████████ ......................................................... 10

   Monitoring and Enforcement of Partner Agreements ........ 11

     ████████████████████████████ ............... 11

     ██████████████ ................................................... 13

       █████████████ .................................................. 14

       ███████████████ ............................................. 16

       ████████ ............................................................ 16

       ███████████████████ ..................................... 16

   Concerns Regarding Sales Partners ................................ 17

     ██████████████████████ ............................... 17

   Applying Private Sector Best Practices to USPS ............... 17

   Forthcoming OIG Research ............................................... 18

   OIG Recommendations ..................................................... 18

   Summary and Evaluation of Management's Comments ...... 19

Appendices ............................................................................ 23

   Appendix A: ██████████████████
   ██████████ ....................................................................... 24

   Appendix B: Private Sector Best Practices for Sales Partnerships ...... 27

   Appendix C: Management's Comments .............................. 28

Contact Information ................................................................ 40

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/29/22   PageID.151   Page 4 of 43

# Executive Summary



_____ the Postal Service has relied extensively on middlemen, known as "channel partners." For example, PC Postage providers help shippers print and pay for official USPS postage from their computers. "Resellers" are intended to act as outsourced Postal Service sales representatives that recruit small-and-medium-sized shippers. Other channel partners provide shipping-related services, such as shipping software, logistics, fulfillment, and online marketplaces.

The links between these partners are extraordinarily complex, as they often work together to serve different aspects of a shipper's needs. One channel partner conglomerate, Stamps.com, says that its family of companies ships 42 percent of all Priority Mail, USPS' flagship parcel product.



## Highlights



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

1

Case 2:22-cv-00627-JNW-SCD   Document 10-1   Filed 09/29/22   PageID.152   Page 5 of 43

The OIG began research on this self-initiated project in September 2017. There are many other critical issues related to channel partners and NSAs that are outside the scope of this initial report, and the OIG has begun additional research on some of those topics. This includes assessing the effectiveness of the NSA program and evaluating PC Postage providers and USPS' internal electronic postage systems.

The Postal Service acknowledges some of the challenges in the partnership space and says that it is taking steps toward addressing them. 

### The OIG Recommends that the Postal Service:



# Observations

## Introduction

Americans are changing the way they shop. Instead of going to brick-and-mortar retailers, consumers are more apt than ever to take out their smartphones and order an item online or shout their order to their smart speaker. All told, U.S. consumers bought $452 billion in online merchandise in 2017 – double what they spent in 2012.[1]



■ 

■ 



■ 

In addition, there have been a number of allegations regarding improper channel partner behavior. In this report, the U.S. Postal Service Office of Inspector General (OIG) will outline the domestic package channel partnerships, how those partnerships have changed and become more entangled over time, the challenges this poses, and potential remedies for those challenges.

## History of Partnerships and Discounts

The Postal Service has long worked with private companies that help it with everything from technology to mail sortation to customer service. Often, partners are paid in the form of postage discounts. For example, Mail Service Providers such as print shops and mail houses have long served as de facto USPS agents, helping businesses use the mail more efficiently.[5] By doing tasks such as presorting and pre-barcoding, these partners can get "workshare discounts" on postage.[6] The discounts are tied to the costs USPS avoids by not having to do those activities.[7] Workshare discounts for First-Class Mail go back to 1976.

---

1   U.S. Census Bureau, *Retail Indicators Branch*, February 16, 2018, https://www.census.gov/retail/mrts/www/data/excel/17q4table1.xls.

2   

3 

4 

5   U.S. Postal Service Office of Inspector General, *Mail Service Providers*, Report No. MS-WP-15-003, August 31, 2015, https://www.uspsoig.gov/sites/default/files/document-library-files/2015/ms-wp-15-003.pdf, p. 1.

6   In 2010, the OIG estimated the value of worksharing to be $14.8 billion in avoided costs. U.S. Postal Service Office of Inspector General, *Assessment of Worksharing*, Report No. RARC-WP-10-005, July 12, 2010, https://www.uspsoig.gov/sites/default/files/document-library-files/2015/rarc-wp-10-005_0.pdf, p. i.

7   39 U.S.C. § 3622(e)(2).

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

3

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/29/22   PageID.154   Page 7 of 43

Package-related worksharing traces back to 1991, when USPS first offered discounts for transporting Parcel Post packages closer to their final destination. Those discounts helped fuel a major resurgence in Parcel Post and spurred a package consolidation industry that is thriving today.[8] Most of the Postal Service's commercial mail and packages are now covered by a workshare-based discount.[9]

> *Traditionally, postage discounts to partners were tied to the costs USPS avoided by using the partner.*

### USPS Outsources Electronic Postage to PC Postage Providers

As the Internet grew in the late 1990s, mailers and shippers wanted a way to print labels and postage from their computers. While other carriers had developed their own software to do this, the Postal Service made the decision to outsource this activity to private sector partners. In 1999, USPS introduced "PC Postage," which is USPS-approved, third-party software that allows mailers and shippers to pay for and print their postage from a computer or the internet.[10] The Postal Service approved Stamps.com, Pitney Bowes, and Endicia over the next several years.[11]

### Postal Reform Greases the Wheels for Negotiated Service Agreements

In 2006, Congress passed sweeping postal reform legislation that, among other things, made it easier for the Postal Service to execute Negotiated Service Agreements (NSAs). These agreements are contracts for discounted postage or special terms of service that are not generally available to all mailers or partners.[12] While NSAs were legal prior to the 2006 law, the regulatory process

was perceived to be cumbersome and complex.[13] NSAs, which must be approved by the Postal Regulatory Commission (PRC), are specific to a particular product, such as Priority Mail. For example, a Priority Mail NSA with Jill's Handbags Inc. (a fictitious company used for illustrative purposes) would lay out the specific rates that Jill's Handbags would pay to ship Priority Mail packages of different weights over varying distances. Often the company can earn additional discounts if it hits pre-defined volume targets that are spelled out in the contract. As is common in the shipping industry, the more packages shipped, the bigger the discount. Because most package products are classified as "Competitive," the details of those NSAs are confidential.[14]



---

8   U.S. Postal Service Office of Inspector General, *Assessment of Worksharing*, Report No. RARC-WP-10-005, July 12, 2010, https://www.uspsoig.gov/sites/default/files/document-library-files/2015/rarc-wp-10-005_0.pdf, p. 3.
9   U.S. Postal Service, *Significant Years in U.S. Postal History*, accessed April 25, 2018, https://about.usps.com/publications/pub100/pub100_076.htm and U.S. Postal Service Office of Inspector General, *Assessment of Worksharing*, p. i.
10  U.S. Postal Service, *Postage Meters and PC Postage*, accessed April 25, 2018, https://pe.usps.com/businessmail101?ViewName=PostageMeter.
11  U.S. Postal Service, *Significant Years in U.S. Postal History* and PC Postage Authorization letters for Stamps.com, Endicia, and Pitney Bowes. The fourth PC Postage provider, EasyPost, was approved in 2017.
12  "Negotiated service agreement means a written contract, to be in effect for a defined period of time, between the Postal Service and a mailer that provides for customer-specific rates or fees and/or terms of service in accordance with the terms and conditions of the contract. A rate associated with a negotiated service agreement is not a rate of general applicability." 39 C.F.R. § 30001.5(r).
13  Postal Regulatory Commission, *Section 701 Report: Analysis of the Postal Accountability and Enhancement Act of 2006*, September 22, 2011, https://www.prc.gov/sites/default/files/testimonies/701_Report-092211.pdf, p. 52.
14  The Postal Regulatory Commission classifies some products as "Competitive."
15



### Ecommerce Boom, Technology Roil the Package Market

16
17
18

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

5

Other key changes in the package market dealt with exclusivity and technology. In the past, businesses tended to send all their shipments through one private carrier, which provided them with hardware and proprietary software that allowed them to manage all their shipments. █████

██████████████████████████
██████████████████████████

██████████████████████████
██████████████████████████

*Historically, shippers sent all their packages through one carrier. Now shippers use software to determine the best carrier for each package.*

This exclusivity model was turned on its head by multi-carrier shipping software, which allows shippers to compare prices, print labels, and manage shipments across carriers. As merchants sold more and more of their items online, demand for this type of shipment optimization software grew. ████████████ ████████████████████████████ ████████████████

Channel partners are a diverse collection of companies that serve as middlemen between shippers (e.g. an ecommerce merchant) and the carrier that will deliver the merchandise to the customer. Like multi-carrier shipping platforms, most channel partners offer merchants ecommerce-related services, such as logistics, fulfillment, or online sales marketplaces, as is shown in Figure 2. As part of that service, they often help the merchant determine how to ship their products and are in a strong position to give the Postal Service visibility with shippers.

**Figure 2: Key Categories of Channel Partners**



TYPES OF USPS CHANNEL PARTNERS

Channel partners are middlemen that offer ecommerce or shipping-related services and often help give the Postal Service visibility with shippers.

| Category | What They Do | Example Firms* |
|---|---|---|

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

6

Both PC Postage providers and resellers began growing their businesses by striking often complicated deals with other channel partners.







As explained earlier, the law surrounding NSAs changed in 2006, though the rules are different depending on the product category. For "Market Dominant" products, which include First-Class Mail and Marketing Mail, the Postal Service must meet a higher regulatory bar to execute an NSA, including having a full public debate and disclosure.[22] There was only one NSA of this type in effect during FY 2017.[23] For "Competitive" products, which include most packages, the regulatory bar is lower.[24] Essentially, the Postal Service must demonstrate to the PRC that the deal would cover its costs and not result in a direct loss for the Postal Service. In approving NSAs, the PRC does not assess whether the Postal Service has made the best deal, only that the NSA has more than covered its costs.[25] Given that most packages have a healthy profit margin, the Postal Service does have the ability to offer discounts and still make money.

---

19

20

21

22  Market Dominant NSAs must be available to similarly situated mailers and must not cause unreasonable harm to the marketplace. 39 U.S.C. § 3622(c)(10) and 39 C.F.R. § 3010.40.

23  U.S. Postal Service, "FY 2017 Annual Compliance Report," Postal Regulatory Commission Docket No. ACR2017, December 29, 2017, https://www.prc.gov/docs/103/103292/FY.17.ACR.pdf, p. 46.

24  Competitive NSAs must meet the same standards as any other competitive product, including covering their attributable costs and helping offset the Postal Service's institutional costs. 39 U.S.C. §§ 401(3), 3633(a) and 39 C.F.R. § 3015.7(c).

25  Competitive products must, collectively, generate enough product-level profit to cover at least 5.5 percent of USPS' institutional costs. 39 C.F.R. § 3015.7(c). In reality, they cover about 23 percent. Postal Regulatory Commission, *Annual Compliance Determination Report Fiscal Year 2017*, March 29, 2018, https://www.prc.gov/docs/104/104398/2017_ACD.pdf, p. 81 and *Save the Post Office*, April 3, 2018, https://savethepostoffice.com/talk-about-fake-news-how-a-flawed-citigroup-analysis-led-to-trumps-bogus-tweets-about-amazon-and-the-postal-service/.

26

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/29/22   PageID.158   Page 11 of 43

**Figure 3: Priority Mail NSAs Surge**



## A GUSH OF PRIORITY MAIL NSAS

USPS has dramatically expanded its use of Negotiated Service Agreements (NSAs) from 66 product agreements in FY 2012 to 786 in FY 2017. These exclusive deals provide extra postage discounts above the volume-based deals USPS offers all shippers.

**Number of NSAs\***

786

- Parcel Return Service
- Parcel Select
- Priority Express
- First Class Package Service
- Priority Mail

66

*Some NSA contracts include agreements for multiple products. This graphic reflects the count of individual product agreements. Also, some Parcel Select and Parcel Return Service contracts include separate agreements for different types of drop ship locations. Those are counted as separate agreements in this analysis.
Source: OIG analysis of Postal Regulatory Commission data.





Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

8

## Management of Channel Partnerships



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

9

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/26/22   PageID.160   Page 13 of 43



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

10

## Monitoring and Enforcement of Partner Agreements



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

11

As Postmaster General Megan Brennan said in her written statement to the House Committee on Oversight and Government Reform: "[Package] products provide an essential - and growing - level of contribution to help us pay for our institutional costs, and thus help to sustain the network that benefits all mailers."[48]

48  *Accomplishing Postal Reform in the 115th Congress – H.R. 756, The Postal Service Reform Act of 2017: Hearing before the Committee on Oversight and Government Reform*, House of Representatives, 115th Cong., 1st sess. (February 7, 2017) (statement of Megan Brennan, Postmaster General and Chief Executive Officer of USPS), http://docs.house.gov/meetings/GO/GO00/20170207/105526/HHRG-115-GO00-Transcript-20170207.pdf, p. 15.
49
50



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

13

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

14

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/26/22   PageID.165   Page 18 of 43

↰ BACK to COVER



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

15



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

16

## Concerns Regarding Sales Partners

Beginning in 2016, several media outlets and financial research organizations started publishing concerns regarding the behavior by and between channel partners, particularly PC Postage vendors and resellers. The allegations, at a high level, state that certain PC Postage providers were working with resellers to route shipments from existing USPS customers through resellers' discounts on a massive scale.[68] The articles also point to the soaring financial fortunes of these PC Postage providers at a time when the Postal Service is doing less well. Postal Service officials have publicly dismissed these articles, pointing to inaccuracies in the reporting.[69]



## Applying Private Sector Best Practices to USPS



68  "Stamps.com: A closer look at the creation of the postage reseller program and its flaws; Potential solutions and remedial actions all likely have negative consequences for Stamps.com," *The Capitol Forum*, December 12, 2016, https://thecapitolforum.com/wp-content/uploads/2017/04/Stamps.com-2016.12.12.pdf and Craig Timberg, "As U.S. Postal Service struggles, Stamps.com fortunes rise" and Prescience Point, *Stamps.com: The software valeant?*, 2016, http://www.presciencepoint.com/reports/PresciencePoint_STMP_Report_7-16-2016.pdf.
69  Bill McAllister, "USPS postage reselling program scrutinized," *Linn's Stamp News*, August 1, 2017, https://www.linns.com/news/postal-updates/2017/august/usps-postage-reselling-program-scrutinized.html. There were differing views within the Postal Service when interviewed by the OIG regarding the allegations made in the media.
70

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/26/22   PageID.168   Page 21 of 43



## OIG Recommendations

### Forthcoming OIG Research

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

18

Case 2:21-cv-00627-JNP-JCB   Document 10-1   Filed 08/26/22   PageID.169   Page 22 of 43

## Summary and Evaluation of Management's Comments

In its extensive written comments, Postal Service management claimed that the OIG's report contains commercially sensitive information and should only be disclosed to postal management. Further, the Postal Service has characterized this kind of OIG work as only to be conducted at the request of, and with the approval of, the Postal Service's Board of Governors. Management also disagreed with many of the OIG's findings.



### Authority and Independence of the Inspector General

Management's first comments regarding this project are an attack on the independence of the OIG and an attempt to keep important work from being disclosed to critical stakeholders. Since its creation in 1996, the OIG has been charged with providing independent analysis of Postal Service operations, and making recommendations to improve those operations. Management, however, now asserts in the beginning of its response to this report that it is their view that work by this component of the OIG should be conducted "at the request and with the approval of the Postal Service Governors" and suggests that our work in this area is "primarily for the benefit of the Governors (and in the absence of Governors, for the benefit of the Temporary Emergency Committee…)." Additionally, management asserts that the results of our work should be disclosed

only to Postal Service management. These assertions are an unacceptable attempt to infringe on OIG authority.

In 2006, Congress streamlined the Postal Service's ability to create partnerships to build its competitive business. The OIG has now analyzed how the Postal Service uses this ability, as is our responsibility. In its response, the Postal Service indicates our report should be provided to "the Temporary Emergency Committee and postal management only." It does not make any allowance for providing the work to key decision makers, such as Congress, and other stakeholders for their consideration as they evaluate critical Postal Service financial issues.

As the response indirectly references and those familiar with the Postal Service well know, an important part of the Postal Service governance structure, the independent Board of Governors, is currently missing. Although the Board is intended to be composed of nine independent members as well as the Postmaster General and the Deputy Postmaster General, there have been no independent members of the Board since December 2016. Thus, this leaves the Temporary Emergency Committee, made up of the Postmaster General and the Deputy Postmaster General, at the helm.

Conducting OIG work solely at the behest and control of Postal Service management would result in a self-serving oversight model, one which was resoundingly rejected in 1996, when the independent OIG was created. Then-chairman of the House Subcommittee on the Postal Service, Rep. John McHugh, remarked that "[this OIG legislation] …will… settle once and for all the nagging problem of an agency's chief law enforcement officer and member of postal management serving as its Inspector General."[71] Management's approach to this category of OIG work would undo what was settled by statute more than twenty years ago and is antithetical to the very reason for the existence of Inspectors General.

Over the years, OIG audit and research reports have informed management, Congress, and stakeholders about a variety of issues related to the

---

71  142 Cong. Rec. E1159-03 (daily ed., June 25, 1996) (statement of Rep. John M. McHugh).

Postal Service's operations, business strategy, and financial condition. Some of our work has focused on commercially sensitive issues and we consistently ensure that information in our reports that is potentially harmful to the Postal Service's commercial or security interests is redacted. However, all our work is provided in its entirety to postal management and congressional oversight to keep both fully and currently informed.

We are cognizant of the sensitivity of the market and the competitive nature of the Postal Service pricing strategy that is addressed at a high level in this report. Thus, we are posting the cover page of the report, so that the public is aware that this work was conducted. Consistent with our history, we are providing the full report to postal management for their action, and to our congressional oversight committees.

It is unlikely that management would have attempted this attack on IG independence were there a fully constituted, independent Board of Governors in place. Left without that oversight, management appears to be attempting to lay the foundation for limiting critical oversight of its competitive business for the future, which we do not accept.

### Sufficiency of Evidence

With regards to the facts and findings in our report, postal management argues that in a number of places, we make statements but do not provide sufficient evidence to support them. Given that this report covers a complex and commercially sensitive area of the Postal Service business, we were cautious in our writing to avoid disclosing specific confidential information. However, we will provide a few examples of the evidence we collected below to address some of management's particular comments.





### Competitive Dynamics in the Package Market



### Alleged Inaccuracies in our Report

### Questions of Logic

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

21

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/26/22   PageID.172   Page 25 of 43



### The OIG's Financial Analysis

### Recommendations

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

22

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/29/22   PageID.173   Page 26 of 43

↰ BACK *to* COVER

# Appendices

Click on the appendix title below to
navigate to the section content.

Appendix A: ███████████████████████████ ...................................................24

Appendix B: Private Sector Best Practices for Sales Partnerships ...................................27

Appendix C: Management's Comments ....................................................................28



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

24



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

25



78 ████████████████████████████████████████████████████████████████████████████████████

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business                    26
Report Number RARC-WP-18-010



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

27

# Appendix C: Management's Comments


**UNITED STATES POSTAL SERVICE**

July 13, 2018

MOHAMMAD ADRA
ASSISTANT INSPECTOR GENERAL

SUBJECT:   Postal Partnerships: The Complex Role of Middleman Discounts in the USPS Package Business White Paper Response (RARC-WP-XX-XXX)

Management disagrees with the report in many respects as the Office of the Inspector General (OIG) expresses opinions and reaches conclusions that are very subjective and not supported by facts. This omission of supporting facts makes it difficult to prepare a detailed response, as there are few objective details to analyze and evaluate. That said, the Postal Service will attempt to highlight the deficiencies in the report about which we have concerns.

**Commercial Sensitivity:**

**As a preliminary matter, we would like to reiterate our position that this paper, which was prepared by your Risk Analysis Research Center (RARC), should not be made publicly available in any respects, since it involves an analysis and recommendations concerning an important component of our competitive products pricing strategy. As you know, it is our view that the responsibility of RARC is to conduct independent research and analysis dealing with economic, business, and public policy issues affecting the Postal Service at the request and with the approval of the Postal Service Governors as an important aide in their development of postal strategy. Since RARC's work is primarily for the benefit of the Governors (and in the absence of Governors, for the benefit of the Temporary Emergency Committee of the Board of Governors), and since, in this instance, this particular work deals with highly commercially sensitive proprietary business information concerning our pricing strategy related to the competitive portion of our business, we do not believe that any portion of the report should be made publicly available.**

**Your recent announcement that you will be transitioning RARC's work to more of an Inspection and Evaluation function does not change our view in this regard. Our review of the "Quality Standards for Inspection and Evaluation" that is issued by the Council of the Inspectors General on Integrity and Efficiency (CIGIE) makes it clear that an important component of the Inspection and Evaluation function is for Inspectors General to work constructively with management to improve agency program effectiveness, and to provide information that is timely, credible, and useful for agency management. CIGIE guidance also recognizes that the Inspection and**

475 L'ENFANT PLAZA SW
WASHINGTON DC 20260-5857
WWW.USPS.COM

Evaluation function should be tailored for the unique mission of the agency. In the case of the Postal Service, and particularly with regard to the competitive portion of our business, we were by statute given commercial freedoms and the ability to fairly compete in the marketplace, free to make decisions in a businesslike manner, buffered from direct political control, but subject to market forces and the knowledge that competition would provide constraints on our actions. Our unique mission in the competitive environment buttresses our position that this White Paper on our competitive product pricing strategy should be made available to the Temporary Emergency Committee and postal management only, and should not otherwise be published or made available to competitors, customers, or other members of the public.

The unique mission of the Postal Service is further evidenced and bolstered by the provisions of 39 U.S.C. section 410(c). That section provides that, despite the application of the Freedom of Information Act to the Postal Service, we are not required to disclose information of a commercial nature which under good business practice would not be publicly disclosed. This provision is a direct recognition by Congress of the unique commercial nature of the Postal Service, and it is beyond dispute that information concerning pricing strategy is "of a commercial nature," and that no good business would disclose it.

Finally, nothing in the Inspector General Empowerment Act compels a different result. While it is true that section 4(e)(1) requires Inspectors General to provide certain information to Congress and others, that provision only applies to a "recommendation for corrective action to the agency." For the reasons noted above concerning the responsibilities of RARC and our understanding of how the Inspection and Evaluation function should be crafted based upon the unique mission of the Postal Service, we do not see the recommendations in this report as being "recommendations for corrective action." In addition, we would note that section 4(e)(2) of the Inspector General Empowerment Act states that "[n]othing in this subsection shall be construed as authorizing an Inspector General to publicly disclose information otherwise prohibited from disclosure by law." This provision reaffirms the principle that information protected from public disclosure by law remains subject to protection, and it would therefore be extremely incongruous to interpret the Inspector General Empowerment Act to require disclosure here, given our unique mission, our highly commercial nature (especially in the competitive portion of our business), and the existence of the protections of 39 U.S.C. section 410(c). This is particularly true when the phrase "recommendation for corrective action" is subject to a very natural interpretation which fully reconciles all of the interests described herein. The

2

**white paper on our competitive product pricing strategy should only be made available to the Temporary Emergency Committee and postal management. Comments on the OIG's Overall Analysis:**

Many of the claims made by the OIG are based on speculative assumptions and/or do not appear to fully consider the market realities within which the Postal Service operates.  Certain claims are framed as being factual and generally applicable, but are based on a single instance or one individual's opinion.  The result is that the paper's recommendations rely on assertions of fact with little or no justification, coupled with a flawed financial model to illustrate the economic impact of the recommendations.  Specific examples are listed below.

- 

- 

- 

3

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

30



4



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

32

Case 2:22-cv-00627-SNF-JCB   Document 10-1   Filed 09/29/22   PageID.193   Page 36 of 43



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

33



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

34

Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/29/22   PageID.185   Page 38 of 43



Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

35



9

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

36

10

Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business
Report Number RARC-WP-18-010

37



Case 2:22-cv-00627-JNP-JCB   Document 10-1   Filed 09/29/22   PageID.189   Page 42 of 43



Dennis R. Nicoski
Acting Senior Vice President
Sales and Customer Relations

Sharon D. Owens
Vice President
Pricing and Costing

cc:  Mr. Corbett
     Ms. Krage Strako
     Mr. Crum
     Mr. Diaz
     CARM Manager
     e-FOIA@uspsoig.gov

12



OFFICE OF
## INSPECTOR GENERAL
UNITED STATES POSTAL SERVICE

Contact us via our Hotline and FOIA forms.
Follow us on social networks.
Stay informed.

1735 North Lynn Street
Arlington, VA  22209-2020
(703) 248-2100

  

**We conducted work for this white paper in accordance with the Council of the Inspectors General on
Integrity and Efficiency's Quality Standards for Inspection and Evaluation (January 2012).**